JOHN W. HUBER, United States Attorney (#7226)
ANDREW CHOATE, Assistant United States Attorney (#13615)
STEPHEN L. NELSON, Assistant United States Attorney (#9547)
JENNIFER E. GULLY, Assistant United States Attorney (#15453)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone:  (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-CR-00323 |
| Plaintiff, | MOTION TO PRECLUDE AND LIMIT DEFENDANT'S MENTAL HEALTH EXPERT TESTIMONY |
| v. | |
| WILLIAM KEEBLER, | Judge David Sam |
| Defendant. | |

---

Defendant William Keebler was indicted by a federal Grand Jury with two counts: (1) attempting to damage federal property by means or a fire or explosive in violation of 18 U.S.C. § 844(f); and (2) carrying or possessing a firearm during a crime of violence in violation of 18 U.S.C. §924(c). (Dkt. No. 16.)

Count 1, which charges a violation of 18 U.S.C. 844(f), is a specific intent crime. *United States v. McVeigh*, 153 F.3d 1166, 1196-97 (10th Cir. 1998) ("[T]he plain language of the statute indicates that the required criminal intent is 'maliciously' One acts maliciously if he or she acts 'intentionally or with willful disregard of the likelihood that damage or injury will result.'") (citations omitted).

Mr. Keebler provided notice that he intends to introduce expert testimony through Dr. Angela Eastvold, Ph.D., ABPP, relating to his "mental defects or mental condition regarding his

cognitive functioning" and "his personality traits, disorders and psychological make up [sic] as they relate to the predisposition and inducement prongs of the defense of entrapment." (Dkt. No. 51.)

In a subsequent filing under Rule 16(b)(1)(C), Federal Rules of Evidence, Mr. Keebler provided more specific notice about the focus of the expert testimony: "Dr. Eastvold will testify to Mr. Keebler's mild neurocognitive disorders in working and learning memory, his personality style, and his susceptibility to manipulation. She will also testify about his clinically significant anxiety and paranoia features….This testimony will help the jury evaluate the inducement and predisposition prongs of entrapment as they apply to Mr. Keebler." (Dkt. No. 77.)

The United States recognizes the role that mental health experts could play in providing jurors with neurocognitive testing results and personality assessments. Both are potentially relevant to the elements of the charged crimes and to the defense of entrapment.

But the United States respectfully requests in limine that the court preclude the defense from introducing mental health expert testimony about Mr. Keebler's mental defects or mental condition regarding his cognitive functioning and his personality traits, disorders and psychological make-up, including testimony that (1) Mr. Keebler was "susceptible to manipulation" and (2) was not likely to be predisposed to criminal behavior because it would be "uncharacteristic" based on his personality style, anxiety style, and paranoia features.  That testimony, while potentially relevant under Rule 401, Federal Rules of Evidence, nevertheless should be excluded under Rules 402, 403, and 702, and limited by 704(b), Federal Rules of Evidence.

The United States also respectfully requests in limine that the court limit Dr. Eastvold's testimony as it relates to certain statements about the charged criminal conduct and investigation

that Mr. Keebler made to her during her interview of him. While Rule 803(4), Federal Rules of Evidence, provides a hearsay exception for statements made for (and reasonably pertinent to) medical diagnosis and treatment, that does not apply to his statements about fault, this case, or his statements about his relationships with the government agents.

Finally, the United States respectfully requests in limine that the court limit Dr. Eastvold's testimony as it relates to certain statements about the charged criminal conduct and investigation of Mr. Keebler that Irene Lopez and Ed Smith made to Dr. Eastvold during her collateral interviews with them. Those statements are not covered by a hearsay exception and should be excluded.

## INTRODUCTION

### A.    Relevant Facts

On June 21, 2016, Mr. Keebler pushed a button several times, a button that he believed detonated a bomb in the doorway of a Bureau of Land Management (BLM) cabin located in Mt. Trumbull, Arizona. That moment followed months of planning by Mr. Keebler to "go on the offensive" against the BLM and the federal government, a goal he was committed to act on after he returned to Utah in late April, 2014 from the armed Bundy Ranch/Brunkerville stand-off, and that took on a new sense of urgency after Lavoy Finicum's death became a defining moment of the Malheur Refuge occupation in Oregon.

The evidence will show that Mr. Keebler's fascination with explosive devices was a long-standing one, and that his desire to commit acts of violence against the federal government and, specifically, the BLM, predated the government's decision in May, 2014 to open an investigation of him based on his role at the Bundy Ranch armed stand-off.  Numerous recordings and video recordings of the conversations between the defendant and the government agents during the

investigation demonstrate that they simply afforded Mr. Keebler the opportunity and means to commit the crimes for which he is charged.

Mr. Keebler is not an innocent citizen whose will was overcome or manipulated by the government to commit these crimes. He spent months repeatedly and unambiguously expressing his hatred for the BLM, the federal government, and others, and the evidence will show that he held such views before any investigation of him. He expressed his willingness to kill victims to achieve his objectives of defending ranchers' rights from the federal government and protecting the country from Muslims and others.  Indeed, the evidence will show that it was his early and repeated statements about the federal government being "the enemy," and his willingness to take up violence against the federal government and its employees, that led, in part, to the introduction of undercover agents in his investigation in April, 2015.

The evidence will also show that throughout his dealings with those undercover agents, Mr. Keebler was continuously interacting with other members of the militia and patriot movements and actively exploring opportunities to create another violent engagement with the federal government and, in particular, the BLM.  He was well-aware of the illegality of his plans to go "on the offensive" against the federal government and ultimately to bomb the cabins at Mt. Trumbull, Arizona. At the time he decided to initiate a harassment campaign against the BLM by bombing the cabins at Mt. Trumbull, the evidence will show that he had already spent months planning with Mr. Finicum and others about how to lure BLM agents onto Mr. Finicum's ranch to collect cattle and how, once there, the BLM agents would not leave alive. After Mr. Finicum's death in early 2016, Mr. Keebler's obsession with attacking the BLM intensified. He asked one undercover agent for an explosive device and then spent the next several months planning to use it in Arizona. He did so in the middle of the night on June 21, 2016.

### B.     Legal Standard for Entrapment Defense

In *Sorrells v. United States*, 287 U.S. 435, 442 (1932) and the Supreme Court held that a just legal system was fundamentally at odds with finding an otherwise innocent person criminally responsible for actions he took because (a) the government improperly induced and coerced him to do so after (b) planting the "criminal design" in his mind. "[A] line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v. United States*, 356 U.S. 369, 372 (1958). "The function of law enforcement is the prevention of crime and apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *United States v. Russell*, 411 U.S. 423, 434-35 (1973).

At bottom, entrapment is a limited affirmative defense. The defendant concedes his role in the commission of a crime but, much like the affirmative defenses of duress or necessity, offers a justification or excuse for it: government entrapment. With an entrapment defense, a defendant argues that (a) the government induced him to commit the crime and (b) he was not predisposed to commit the crime because the idea for the crime originated with the government.

Inducement is government conduct that "creates the substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Scull*, 321 F.3d 1270, 1275 (10th Cir. 2003). Inducement is measured against an innocent, reasonable person. To establish inducement, the defendant must show not only that the government provided an offer, opportunity, or means to commit a crime, but also that the government engaged in "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or please based on need, sympathy or friendship" to convince the defendant to commit the crime. *See id.*

That said, it is "defendant's lack of  [ ] predisposition that is the crux of the entrapment defense." *United States v. Ford*, 550 F.3d 975 (10th Cir. 2008) (citing *United States v. Fadel*, 844 F.2d 1425, 1429 (10th Cir. 1988)). Tenth Circuit analysis of predisposition looks at a totality of factors to determine what motivates, reflects, or demonstrates a particular defendant's willingness to commit the crimes.  It may be a defendant's "desire for profit, his eagerness to participate in a transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity." United States v. *Tee*, 881 F.3d 1258, 1265 (10th Cir. 2018) (citing *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005)).

Entrapment, like duress, "focuses on a defendant's state of mind . . . ." *Fadel*, 844 F.2d at 1431. As a result, "the defense of entrapment is intertwined with the issue of intent . . . ." *Id.* at 1430. "It protects only those who lack criminal predisposition, allowing government conduct to go unchecked in cases where criminally minded defendants are involved."  *United States v. Dyke*, 718 F.3d 1282, 1287 (10th Cir. 2013) (distinguishing between entrapment and limited defense of outrageous government conduct). That said, "[i]f the conduct of the undercover agents was so domineering that the defendant failed to form the necessary *mens rea* for an offense, he must be acquitted.  Even if the necessary *mens rea* is present (and *actus reus* of course), if the government's conduct forced the defendant to engage in a crime or induced him to commit a crime he wasn't predisposed to commit, he will be able to invoke the duress or entrapment defense." *Id.* at 1286 (italics in original).

The defendant bears the initial burden of producing evidence to show inducement and lack of predisposition. "The defendant must point to evidence of both lack of predisposition and government inducement before the trial judge can determine whether entrapment has been shown

sufficiently to present it to the jury." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). If there is sufficient evidence of both, the burden of proof shifts to the government to prove, beyond a reasonable doubt, that there was no inducement or that the defendant was predisposed to commit the crimes. *See Nguyen*, 413 F.3d at 1178. "[I]f the government disproves either element then the entrapment defense will fail." *Ford*, 550 F.3d at 982.

### C.    Legal Standard for Expert Mental Health Evidence

The Insanity Defense Reform Act of 1984 (IDRA) is the starting point to evaluate the admissibility of proffered expert mental health evidence. Congress passed the law in the wake of John Hinckley's acquittal of charges related to his shooting of President Ronald Reagan. The IDRA states: "It is an affirmative defense to a prosecution under any Federal statute that, at the time of commission of acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. *Mental disease or defect does not otherwise constitute a defense*." 18 U.S.C. § 17(a) (emphasis added).

In addition, the IDRA limited the use of expert mental health testimony on ultimate legal issues by amending Rule 704, Federal Rules of Evidence: "In a criminal case an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."  One example of an "ultimate issue" anticipated as being beyond the scope of expert testimony was whether a defendant had a "lack of predisposition in entrapment." *United States v. Pohlot*, 827 F.2d 889, 899 (3d Cir. 1987) (providing extensive analysis of IDRA and citing The Report of the Senate Judiciary Committee, S.Rep. No. 98-225, 98th Cong., 2d

Sess. 229 (1984), *reprinted in 1984 U.S. Code Cong & Ad.News* 3182, 3411) (hereinafter the Senate Report)).

There were many legal and political goals at play when IDRA was enacted. The discussion in *United States v. Cameron*, 907 F.2d 1051, 1065-66 (11th Cir. 1990), which relies on the "thorough analysis" in *Pohlot*, is cited with approval by the Tenth Circuit in *United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003). The *Cameron* panel suggests that there are three central principles of congressional reform that guided Congress with the IDRA, and that federal courts "should adhere to" those principles when evaluating the admissibility of psychiatric or mental health expert evidence at trial.  *See Cameron*, 907 F.2d at 1061-62. First, Congress intended to eliminate of any form of legal excuse based on a defendant's lack of volitional control. *Id.* Second, Congress intended "that the insanity defense is not improperly resurrected in the guise of showing some other *affirmative defense*, such that the defendant had a 'diminished responsibility' or some similarly asserted state of mind which would serve to excuse the offense." *Id.* (emphasis in original). And, finally, Congress intended to reduce the dangers posed by expert psychiatric evidence regarding "inherently malleable psychological concepts" that could confuse or mislead the jury.  *Id.*

## DISCUSSION

As noted above, the defendant bears the initial burden of establishing evidence that, for the crimes charged in the Indictment, he was induced to commit them and that he was not predisposed to commit them.

The criminal design to bomb the cabins at Mr. Trumbull originated with Mr. Keebler. The United States does not concede that Mr. Keebler was induced to commit the crimes for which he was indicted or that he lacked the predisposition for them. Arguably, any evidence

related to entrapment, including Dr. Eastvold's testimony, is rrelevant until the defendant establishes inducement and predisposition. For the purposes of this motion, however, the United States assumes that Mr. Keebler could proffer sufficient evidence to raise a defense of entrapment.

### A.      Some Mental Health Expert Testimony Relevant under Rule 401

Since 1984, federal courts have grappled with how best to apply the rules of evidence to proposed mental health expert testimony in light of the statutory restrictions of 18 U.S.C. § 17 and the congressional goals of IDRA. Some of the case law has solidified into consistent rules across circuits, but there are some issues, like the admissibility questions presented to the court with this motion, that are still forming. Before moving on to whether expert mental health testimony is relevant to entrapment, it is worth noting what mental health expert evidence clearly is relevant and admissible.

### 1.      Mental Health Expert Testimony Relevant to Mens Rea is Relevant

The Tenth Circuit, and all of its sister circuits, agree that expert psychological or psychiatric evidence is relevant and admissible to negate specific intent. *United States v. Brown*, 326 F.3d 1143, 1146-47 (10th Cir. 2003).  In reaching that conclusion, the courts consistently distinguish between mental health evidence that provides a justification, explanation, or excuse for criminal conduct and mental health evidence that assists the trier of fact in determining whether each element of the charged crime was established beyond a reasonable doubt.  *Id.* at 1147. "The admission of such evidence will depend on whether the defendant clearly demonstrates how such evidence would negate intent rather than 'merely present a dangerously confusing theory of defense more akin to justification and excuse.'" *Id.* (citing *Cameron*, 907 F.2d at 1067).

2. <u>Mental Health Expert Testimony Related to Entrapment Not Clearly Relevant</u>

Mental health expert testimony that goes beyond the issue of mens rea, however, is not as clearly relevant and admissible.

The Tenth Circuit appears to not have addressed this issue with the defense of entrapment.

At best, the Tenth Circuit has conceded that "*a serious deficiency* in a defendant's mental capacity" "*might*" be relevant to entrapment by estoppel. *See United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994) (emphasis added). *Nichols* was decided on other grounds and the panel did not decide this issue. It is unclear what constitutes a "serious deficiency," but, with that phrase, the *Nichols* panel was referring to the defendant in *United States v. Sullivan*, 919 F2d 1403, 1421 (10th Cir. 1990) who clearly had "a serious deficiency in mental capacity" and the resulting "resistance [to influence] of a five to nine-year old."  Significantly, neither *Nichols* nor *Sullivan* was focused on proposed testimony about susceptibility to manipulation. Those cases were focused on expert testimony about the descriptive results of psychological tests.

Based on those cases, it is not at all clear whether, in the Tenth Circuit, evidence of anything less than a "serious deficiency" would be relevant to entrapment. There is nothing in the notices provided by Mr. Keebler, let alone in the expert report prepared by Dr. Eastvold, to suggest that Mr. Keebler is suffering from a "serious deficiency" in his mental capacity or that his functioning and "resistance" to outside influences is akin to that of a young child.

The relevance of expert mental health testimony to the defense of entrapment is a matter of first impression for other circuits as well: "A threshold question here is whether testimony of

[the defendant's] cognitive impairment is even relevant to an alleged entrapment defense, as opposed to an insanity claim or a claim that [the defendant] was not competent to stand trial. While the parties concede that it is relevant, and some non-binding case law seems to support that concession, this Circuit has never expressly held that it is." *United States v. Williams*, 684 Fed.Appx.767, 779 (11th Cir. 2017).

The *Williams* panel, like the panels before it, did not answer the question about the relevance of mental health expert testimony about mental deficits themselves (or how significant and serious those deficits would have to be before they were deemed relevant). Nor did it decide the question about the relevance of testimony about susceptibility based on those quantified deficits. *Williams* did not answer those questions because the panel affirmed the trial court's decision to exclude that testimony that the defendant was susceptible to inducement. Notably, that decision to exclude susceptibility testimony was made by the trial court even when the evidence before the court in that case reflected serious and significant concerns not only about defendant's mental health, but also about his competency for trial. (He was found incompetent to stand trial and then restored to competency.) And yet despite those documented deficits in the defendant's mental functioning, the trial court barred the mental health expert testimony about his susceptibility to inducement because the expert "failed to tie the decline in [the defendant's] cognitive function to an accepted scientific methodology showing that that decline had caused [the defendant] to be particularly susceptible to inducement at the time of his offense." *Id.* at 779-80.

There is some authority from the Fifth and Third Circuits that expert mental health testimony, including testimony about susceptibility, is relevant in entrapment cases: (1) *United States v. Newman*, 849 F.2d 156, 164 (5th Cir. 1988) (when an entrapment defense is raised,

expert psychiatric testimony is admissible to demonstrate that a mental disease, defect or subnormal intelligence may make a defendant peculiarly susceptible to inducement.); (2) *United States v. Hill*, 655 F.2d 512 (3d Cir. 1981) (expert testimony regarding susceptibility to inducement may be relevant because jury may not be able to properly evaluate the effect of subnormal intelligence and psychological characteristics to inducement); and (3) *United States v. Benveniste*, 564 F.2d 335, 339 (9th Cir. 1977) (no direct holding about relevance; the court states "there is some authority" [citing one Fifth Circuit case from 1974] that expert testimony on the issue of predisposition may be admitted [which has questionable value post-IDRA as discussed below]).

As a practical matter, however, the circuit panels in *Newman* and *Benveniste*, even while speaking to the potential relevance and admissibility of susceptibility testimony, nevertheless affirmed the trial court decisions to exclude that testimony. *See Newman*, 849 F.2d at 165 (district court has wide discretion under Rules 702 and 704(b) to preclude evidence); *see also Benveniste*, 564 F.2d 335, 339 (district court excluded expert testimony related to entrapment because it failed helpfulness requirement of Rule 702 and would confuse jury under Rule 403).

To conclude: The limited case law in the Tenth Circuit suggests that serious and significant cognitive deficits that show a defendant to be functioning at the level of a child may be relevant to entrapment.  Under that standard, the noticed evidence about Mr. Keebler's "mild neurocognitive disorders in working and learning memory" or testimony about his "personality style" are not relevant to either inducement or predisposition. It is not clear that such evidence would make a finding of entrapment more or less probable. But, at the edges, perhaps even evidence of a slight cognitive deficit may make a finding of entrapment more probable. If the court embraces a more inclusive standard, then the evidence of Mr. Keebler's test results,

personality styles, susceptibility to manipulation, and likelihood of predisposition may be relevant.

### B.  Mental Health Expert Testimony Excludable Under Rule 402

Even if such evidence and resulting opinion testimony were deemed relevant, pursuant to Rule 402, Federal Rules of Evidence, the court should exclude the opinion testimony regarding susceptibility to inducement and likelihood of predisposition because it is statutorily barred by IDRA and the resulting case law.

The Tenth Circuit has not addressed this issue.

As noted above, the "non-binding case law" referred to directly by the Tenth Circuit *Sullivan* panel, and indirectly by the Eleventh Circuit *Williams* panel, is a triumvirate of cases cited most commonly for the proposition that expert mental health testimony about susceptibility to inducement may be admissible to an entrapment defense: *Newman, Hill, and Benveniste*.

Significantly, *Benveniste* and *Hill* pre-date the IDRA, so the question of admissibility being barred by Rule 402 and IDRA was not before those courts. *Newman*, decided four years after the IDRA, bases its holding on pre-IDRA case law and summarily concludes, with one off-point citation to *Pohlot* and no analysis, that the IDRA does not bar psychiatric testimony for the purposes of an entrapment defense.

Admittedly, outside of the amendment to Rule 704, Federal Rules of Evidence, the congressional record for IDRA, as reported in *Pohlot,* does not explicitly reference the relationship between the affirmative defense of entrapment and expert mental health testimony. But the better reading of the IDRA, and the extensive analysis of it in *Pohlot*, should lead this court to a different answer than *Newman* about whether mental health expert testimony should be admitted to show susceptibility to entrapment.

If the mental health expert opinion testimony about Mr. Keebler's mental disease or defects is not offered to negate mens rea, but rather to support an affirmative defense that is "more akin to justification" of the criminal act as discussed in *Cameron*, 907 F.2d 1051 (11th Cir. 1990) and *Brown* 326 F.3d 1143 (10th Cir. 2003), then the court should find such testimony inadmissible under Rule 402 because it is statutorily barred by IDRA. The noticed mental health testimony about susceptibility and likelihood does exactly what the IDRA prohibits: It offers a justification or excuse for Mr. Keebler's criminal acts. Such testimony improperly suggests that the defendant's mental disorders and defects made him susceptible to government manipulation, Raised in the context of an entrapment defense, such testimony suggests and implies to the jury that, because he was manipulated, Mr. Keebler no longer had the independent will and ability to make choices other than the ones he did and that, as a result, his criminal acts should be excused. IDRA makes it clear that the use of mental disease or defect may not be used to support a defense that way.

The notices filed on Mr. Keebler's behalf are clear that the defense intends to use mental health expert testimony about Mr. Keebler's "mental defects or mental condition regarding his cognitive function," "his personality traits, disorders and psychological make up", and his "neurocognitive disorders, his  personality style, susceptibility to manipulation" and his "clinically significant anxiety and paranoia features,"  "to help the jury consider the defense of entrapment." (Dkt. Nos. 51 and 77.)

That is "precisely the kind of defense that IDRA was designed to foreclose": testimony about a defendant's "inability or failure to engage in normal reflection" or "lack of volitional control."  *Cromitie v. United States*, 2017 WL 1383982 *6 (S.D.N.Y. 2017) (citations omitted) (holding that mental health expert testimony only admissible to support insanity defense or

impeach mens rea, regardless of defendant's psychological need for time, money, and attention and his lack of capability and sophistication).

**B.      Mental Health Expert Testimony Excludable under Rule 403**

If the court finds that the noticed mental health testimony is relevant and not barred by IDRA, the testimony should nevertheless be excluded under Rule 403, Federal Rules of Evidence. The testimony will not be offered to negate specific intent, so its probative value is minimal and is substantially outweighed by the danger of confusing the issues and misleading the jury.

The evidence noticed by Mr. Keebler about his "mental defects or mental condition," his "personality traits, disorders and psychological make up" and his "susceptibility to manipulation" is essentially testimony about his susceptibility to entrapment that will confuse and mislead the jury. Much of Dr. Eastvold's report reflects the defense theory that Mr. Keebler has a brain injury that rendered him susceptible to manipulation by the government, notwithstanding the evidence in the report itself, and the case generally, that undermines the conclusion that he has a brain injury. That tension in her testimony is likely to confuse the jury. Here, there is a high risk that the jury could conclude improperly that Mr. Keebler was induced and didn't have predisposition because the expert offers her opinion that he was susceptible to manipulation even though her findings make it clear that Mr. Keebler does not have a "serious deficiency," "subnormal intelligence," "resistance of a five to nine-year-old" or any other mental disease or defect that would suggest that Mr. Keebler could not or did not participate in the charged crimes knowingly and willingly.

Dr. Eastvold's mental health testimony proposed by the defense  "is strongly suggestive of 'volitional' evidence . . . evidence of the defendant's inability to control his behavior" because

of his relationship with the government agents. *United States v. Dupre*, 339 F.Supp.2d 534, 544 (S.D.N.Y. 2004) (citation omitted), *aff'd United States v. Dupre*, 462 F.3d 131 (2nd Cir. 2006). "The presentation of such evidence to the jury creates a substantial risk that it will be used for an impermissible purpose during deliberations." *Id.*

Expert testimony regarding susceptibility to manipulation and likelihood of predisposition, rather than focusing on Mr. Keebler's ability to form the specific intent to commit the crime, could mislead the jury into excusing his criminal conduct based on evidence that the defendant suffered from mental abnormalities or deficiencies not excused by statute. In other words, the jury might conclude that he was so susceptible to manipulation and inducement, so vulnerable to the attention of the government agents because of his personality style and clinically significant anxiety and paranoia features, that he was unable to form the actual criminal intent for the offenses.

> Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires.

*Pohlot*, 827 F.2d at 890.

Such evidence may also result confuse the issues because it may improperly elicit the sympathies of the jury. To offer her testimony about Mr. Keebler's neurocognitive disorders and personality style, anxiety and paranoia, Dr. Eastvold will need to discuss the bases for them: Mr. Keebler's difficult and abusive childhood, his failed relationships, and his relative lack of success in the world. Jurors may not be able to separate their possible sympathy for Mr. Keebler from their determination about entrapment.

Finally, the jury is likely to be confused about the notion of susceptibility and how to define or limit that concept. If he is more susceptible than the reasonable person to inducement, measured by what and against whom? It will be difficult for the jury to parse the difference between an expert opinion regarding susceptibility to inducement (or an unlikelihood of predisposition) and an opinion that a defendant was induced or not predisposed. "[O]pinions about mental disease may confuse a jury into thinking the opinions show more than they do" simply because "the power of this kind of evidence" may mislead jurors and take them to unsound conclusions. *See Clark v. Arizona*, 548 U.S. 735, 774-76 (2006). Moreover, mental health expert testimony has limited utility when two testifying experts reach opposite conclusions about the impact of a mental disease or condition on a defendant's actions. *Id.*

### C.  Mental Health Expert Testimony Excludable Under Rule 702

The "touchstone" of admissibility under Rule 702, Federal Rules of Evidence, is helpfulness to the trier of fact. *See Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002). If the court finds that the noticed mental health testimony is likely to confuse the jury, the court also has wide discretion to bar it under Rule 702 as evidence that will not "assist the trier of fact to understand the evidence or determine a fact in issue."

The analysis of helpfulness under Rule 702 turns on the two types of mental health testimony Dr. Eastvold is prepared to provide. First, Dr. Eastvold is prepared to testify to the descriptive aspect of her assessment of Mr. Keebler—the part that would describe the neurocognitive and personality tests she performed and the results she received. Second, Dr. Eastvold is prepared to testify what those results mean for Mr. Keebler's defense of entrapment.

To determine whether the testimony will assist the trier of fact, courts not only decide whether the testimony is relevant, but also whether it is "within the juror's common knowledge

and experience," and whether the expert testimony will usurp the juror's role of evaluating a witness's credibility." *United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013) (citations omitted). Here, Dr. Eastvold's descriptive testimony regarding Mr. Keebler's neurocognitive functioning, his personality, and his anxiety and paranoia could help the jury understand more about Mr. Keebler, especially since the tests she administered are accepted and peer-reviewed tests, therefore apparently meeting the general reliability standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

But any interpretive testimony from Dr. Eastvold about whether Mr. Keebler's charged crimes were "uncharacteristic" or about his "susceptibility to manipulation," are not helpful to the jurors and usurps their duty to use their common knowledge and experience to evaluate him and his conduct in light of her testimony about the results of her testing and evaluation. While it is unknown whether Mr. Keebler will testify in his own defense at trial, the jury will have the opportunity to assess his credibility in light of her testimony about his mental deficits and personality style as they view the video recordings and listen to the audio recordings at trial.  Her opinion about the likelihood of his predisposition or susceptibility to manipulation and inducement usurps the jury's role to reach decisions about those elements of entrapment based on all the evidence before them and as measured against an otherwise law-abiding person.

Furthermore, it is not at all clear that expert testimony about Mr. Keebler's "susceptibility to inducement" or likelihood or predisposition will actually be helpful to the jury in weighing all of the other evidence before them to decide the question of whether, in fact, Mr. Keebler actually was induced or predisposed.

That is especially true if the noticed mental health expert testimony about Mr. Keebler's "susceptibility to manipulation" or the likelihood that he was predisposed does not meets the

reliability standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As noted in Section A.2 above, the mental health expert in *Williams* was not able to link the defendant's purported susceptibility to specific testing results and peer-reviewed literature.

For the second part of her testimony to be admitted, Dr. Eastvold must establish how, based on accepted scientific methodology, Mr. Keebler's mild disorders or personality styles cause him to be susceptible to inducement or create an unlikelihood of predisposition. If she cannot do that, then her proposed testimony about susceptibility to manipulation and inducement and her proposed testimony about Mr. Keebler's predisposition in light of that susceptibility should not be admitted.

If the court allows Mr. Keebler to present expert opinion testimony about (1) Mr. Keebler's test results and personality assessments and (2) susceptibility to manipulation as it relates to inducement and predisposition, the United States is prepared to rebut that testimony.

**D.      Mental Health Expert Testimony Limited by Rule 704**

If the court decides that all of Dr. Eastvold's noticed testimony about Mr. Keebler's neurocognitive deficits and personality style are admissible, that testimony is limited by Rule 704, Federal Rules of Evidence, which prevents an expert from opining about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  As noted above, this evidentiary rule was amended by the IDRA to prevent mental health experts from providing opinions on ultimate issues, such as premeditation in homicide cases or "'lack of predisposition in entrapment.'" *Pohlot*, 827 F.2d  at 898-899 (citing the Senate Report).

With this in mind, Dr. Eastvold's testimony about Mr. Keebler's neurocognitive testing results and his personality assessments are admissible and not limited by 704(b). "The rule does

not prevent the expert from testifying to facts or opinions from which the jury could conclude the defendant" was induced or didn't have predisposition for the crime, only from expressly stating the final conclusion or inference as to the defense—that he was induced or not predisposed. *See United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011).

### E.     Mental Health Expert Testimony Limited by Rule 801

Dr. Eastvold's report contains statements in quotes from Mr. Keebler and from Irene Lopez (his friend) and Ed Smith (his cousin). Her report also contains statements from all three that are not direct quotes, but that appear to reflect what they said.  If offered in court, those statements would be improper hearsay statements under Rule 801 and Rule 802, Federal Rules of Evidence. The United States respectfully requests that the court not allow Dr. Eastvold to offer testimony about those quoted statements, especially those that go to Mr. Keebler's criminal culpability.

### 1.     Statements made by Mr. Keebler

Mr. Keebler made his statements to Dr. Eastvold in the context of a meeting for a forensic diagnosis, not treatment.  There is no distinction under Rule 803(4), Federal Rules of Evidence, for statements made in the context of diagnosis for treatment or forensic purposes. While statements made by a defendant to mental health provider for a forensic purpose (like to establish a defense), have the potential to be less reliable than those offered for treatment, the rule allows such statements, if the provider relies on them to reach a diagnosis and the statements are of the sort that would ordinarily be relied upon by experts in the field.

The exception to the general admissibility of statements under Rule 803(4) (and by extension Rule 703) however, are statements are offered in the context of obtaining a diagnosis

but that nevertheless stray into the realm of fault and culpability. Such statements lack any assurance of reliability and should therefore be excluded as hearsay.

Dr. Eastvold's report contains several such statements by Mr. Keebler and those statements should be excluded.

        2.      <u>Statements made by Irene Lopez and Ed Smith</u>

Statements made by Ms. Lopez and Mr. Smith have no shield from exclusion as hearsay. Dr. Eastvold's expert testimony regarding Mr. Keebler's neurocognitive disorders, his mental defects, and his personality style should not be a vehicle for Ms. Lopez's and Mr. Smith's out of court statements about this case to be presented to the jury.

## CONCLUSION

For all the reasons stated above, the United States respectfully requests that Dr. Eastvold's testimony regarding Mr. Keebler's neurocognitive functions, mental disease and defects, noticed by the defense as his personality styles, paranoia and anxiety, susceptibility to manipulation or likelihood of predisposition based on his neurocognitive functioning, personality type, and anxiety and paranoia features, not be admitted as evidence at trial.

The United States also respectfully requests that, if that testimony is admitted, the court appropriately limit that testimony not admit any testimony that amounts to inadmissible hearsay.

DATED this 23rd day of April, 2018.

                                                    JOHN W. HUBER
                                                    United States Attorney

                                                    */s/Jennifer E. Gully*
                                                    Jennifer E. Gully
                                                    Assistant United States Attorney