Adam G. Bridge, #14552
Office of the Federal Public Defender, District of Utah
46 W. Broadway, Ste. 110
Salt Lake City, UT 84101
Phone: (801) 524-4010 │ Fax: (801) 524-4060
Email: adam_bridge@fd.org

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br>vs.<br><br>William Vernon Keebler,<br><br>　　　　　　Defendant. | **Sentencing Memorandum and Position Statement**<br><br><br>Case No. 2:16-cr-323 DS |

Mr. Keebler submits this memorandum and position statement in support of the following recommended sentence: twenty-five months in prison (*i.e.,* time served), two years of supervised release (including Veterans Court), no fine, and a $100 special assessment.

## Introduction

In April 2014 the FBI targeted Mr. Keebler for an undercover investigation. He'd committed no crime. He'd simply been present in Bunkerville, Nevada during an infamous standoff between federal agents and supporters of cattle rancher Cliven Bundy.

Admittedly, Mr. Keebler gave the FBI some initial cause for concern. When

1

he returned home from Nevada, for example, he went online and described the standoff as a great victory for the Patriot Movement. He recast himself as a central character in the protests. He also talked about starting his own militia. The FBI took notice of all this and sent a confidential informant to befriend him.

The FBI's investigation would continue for twenty-six months. It would include five more confidential informants and undercover agents and dozens of carefully orchestrated operations. And in the end, Mr. Keebler did exactly what he was induced to do: he picked a target and "went on the offense."

That was twenty-five months ago. Mr. Keebler has been in jail ever since. It's time to let him go home.

## Sentencing Guidelines

We start, as always, with the sentencing guidelines.[1] They are "the starting point and the initial benchmark" of federal sentencing.[2] Of course, the guidelines don't carry any presumption of reasonableness.[3] They are, at best, "a rough approximation of sentences that might achieve § 3553(a)'s objectives."[4]

The amended charge carries a total offense level of 21.[5] Mr. Keebler has no criminal history for guideline purposes.[6] Together, this yields an advisory guideline range of 37-46 months in prison and 1-3 years of supervised release.[7] Mr. Keebler

---

[1] 18 U.S.C. § 3553(a)(4); *Rita v. United States*, 551 U.S. 338, 347-48 (2007).
[2] *Gall v. United States*, 552 U.S. 38, 39 (2007).
[3] *Rita*, 551 U.S. at 350.
[4] *Id.*
[5] PSR ¶¶ 20-29.
[6] PSR ¶¶ 33-39.
[7] PSR ¶¶ 64, 68.

seeks an 11-month departure or variance.

A modest departure is well-warranted under several guideline provisions, including § 5H1.1 (age), § 5H1.4 (physical condition), and § 5K2.12 (coercion or duress). Factoring in one or more of these, Mr. Keebler's recommended sentence is consistent with the guidelines.

## Offense and Offender Characteristics

The nature and circumstances of the offense and Mr. Keebler's history and characteristics also favor a modest variance.[8]  By any reasonable measure, Mr. Keebler was objectively incapable of committing this offense. And the crime was instigated, refined, and brought to life by the FBI.

   A.   *Offense Characteristics*

After two years of careful prodding, Mr. Keebler tried to damage a BLM cabin with a pipe bomb. He chose a remote location in the Arizona Strip because he didn't want to put any lives at risk. Nevertheless, he committed a serious property crime.

Of course, the FBI built the bomb, drove Mr. Keebler to the cabin, placed the bomb on the cabin, and handed him the detonator. His case raises grave concerns about the FBI's tactics in a post-9/11 world and gives newfound meaning to the phrase "manufacturing crime."[9]

With a guilty plea, most of the FBI's coercive tactics will never see the light of day. Mr. Keebler accepts that. At this stage, the best he can do is object to the PSR

---

[8]  18 U.S.C. § 3553(a)(1).
[9]  *Sherman v. United States*, 356 U.S. 369, 372 (1958).

where necessary and introduce some evidence of entrapment at the sentencing hearing. With respect to the PSR, he offers the following objections:[10]

### Objection #1

PSR ¶ 6 is incomplete and calls for further information.

Mr. Keebler founded the Patriots of America (POA) in 2014, several months after the Bundy Ranch. The POA consisted of several interrelated sub-groups: homesteading, communications, militia, medical, etc. The Patriots Defense Force (PDF) was the militia arm of the POA.[11]

It's noteworthy that the POA/PDF didn't exist when the FBI started its investigation. And two confidential informants, "Leonard Bloom" and "Jake Roberts," were among the group's first members. Bloom was the group's first medical officer. He was active for more than two years and played the quintessential "false friend." Roberts was in the POA/PDF for just a few months. Mr. Keebler kicked him out in January 2015 after finding anti-police rhetoric on his Facebook page. The fact is, there is very little evidence about Mr. Keebler or the POA/PDF that precludes or is untainted by the FBI's investigation.

### Objection #2

The last sentence of PSR ¶ 6 mischaracterizes Mr. Keebler's relationship with Lavoy Finicum.

---

[10] These same objections were served on U.S. Probation and the United States on June 28, 2018. They are resubmitted here pursuant to DUCrimR 32-1(b) in lieu of a separate position statement. They are best read together with the PSR.

[11] A copy of the POA/PDF's by-laws and rules and regulations are attached as Exhibit A.

Lavoy Finicum was a rancher in northern Arizona. Both he and Mr. Keebler attended the Bundy Ranch protests but didn't meet there. After the Bundy Ranch, Finicum returned to Arizona and chose a path similar to Cliven Bundy's: he severed his ties with the federal government, stopped paying his grazing fees, and started paying a self-imposed tax to Mohave County.

In the summer of 2015, Finicum started planning for a BLM operation similar to what Cliven Bundy experienced. He contacted Cope Reynolds, the leader of the White Mountain Militia in Arizona. Reynolds reached out to Mr. Keebler and the POA/PDF.

Mr. Keebler was keen on protecting ranchers. Having experienced the protests at Bunkerville first-hand, he feared the BLM would act more aggressively against Finicum. Mr. Keebler envisioned the POA/PDF as a defensive force if and when the BLM tried to take Finicum's cattle by force and violence.[12]

By November 2015 two more undercover agents had infiltrated the POA/PDF: "Brad Miller" and "Jake Davis." When Finicum invited Mr. Keebler to his ranch, he took Miller and Davis. He treated the trip as a field training exercise (FTX). As usual, the FBI covered the gas and other expenses.[13]

At the ranch, Reynolds and the POA/PDF drove around for several hours, studied maps, and tried to envision what a future BLM offensive might look like.

---

[12] The BLM came for Bundy's cattle after more than two decades of litigation. In November 2015 Finicum's fight against the BLM had just begun; therefore, there was little reason to think an impoundment action was imminent.

[13] The FBI covered Mr. Keebler's expenses on many similar trips. The FBI also made repeated and timely donations to the POA/PDF to keep it (and Mr. Keebler) afloat.

Contrary to the first sentence of ¶ 11, "BLM targets" were never discussed and there was only a passing reference to the cabins at Mt. Trumball.[14]

The Finicum reconnaissance didn't lead anywhere. About a month after Mr. Keebler returned home, Finicum joined the occupiers at the Malheur Wildlife Refuge in Burns, Oregon. He died in Oregon in February 2016.

Mr. Keebler and Lavoy Finicum remained friends until his death. Finicum even asked Mr. Keebler to watch over his family while he was in Oregon—a duty Mr. Keebler took very seriously. As Objection #5 will explain, the FBI later used Finicum's death to push Mr. Keebler to take action against the BLM.

Objection #3

PSR ¶ 7 vastly understates the scope of the FBI's undercover operation. The FBI used at least six confidential informants and undercover agents, including:

1. "Leonard Bloom": April 2014 to June 2016; local truck driver; paid over $60,000 for undercover work.

2. "Jake Roberts": April 2014 to January 2015; payments unknown; participated mostly online; terminated for anti-police rhetoric on Facebook.

3. "Brad Miller": April 2015 to June 2016; FBI agent; legend included background in mining and explosives.

4. "Jake Davis": April 2015 to June 2016; FBI Task Force Officer; legend included career in personal protection and background in hand-to-hand combat

---

[14] The cabins were about 50 miles away from Finicum's ranch.

6

5. "Greg McCray": September 2015 to November 2015; FBI agent; legend as successful businessman interested in joining/funding militia activities; withdrew on verge of trip to Finicum ranch.

6. "FNU LNU": January 2015; payment unknown; attended POA/PDF event at Tooele County building.

Objection #4

The last two sentences of ¶ 7 mischaracterize Mr. Keebler's beliefs, his goals for the POA/PDF, and the nature of his prepping activities.

Mr. Keebler isn't anti-government; he's against corruption in government. He's hardly alone in that. His distrust of the federal government stands in stark contrast to his positive relationships with local authorities. Mr. Keebler actively cultivated relationships with the Stockton Police Department and the Tooele County Sheriff's Office. He applied for permits to host POA/PDF events in public spaces. He invited local officials to events and trainings. And he conducted citizen patrols in Tooele County with the full knowledge and consent of local police.

The reference to "going on the offense" in PSR ¶ 7 is also misleading. Davis and Miller were sworn into the POA/PDF on May 15, 2015. During an FTX that day, Mr. Keebler spoke about various threats to the United States and his belief that the country was headed towards marshal law.

Mr. Keebler spoke frequently about marshal law. It was the primary focus of his prepping activities. He didn't know what would trigger it—a terrorist attack, a natural disaster—but he wanted to prepare for it. Under marshal law, Mr. Keebler

7

expected the federal government to turn against the people. He envisioned house-to-house gun confiscations and the government putting "undesirable" and "unsalvageable" people in FEMA camps.

When Mr. Keebler spoke about "going on the offense" on May, 15, 2015, context is key. Mr. Keebler was preparing to fight a rogue government in a post-apocalyptic America. His comments on May 15, 2015, are meaningless outside that context.[15]

## Objection #5

PSR ¶ 8 misrepresents the events of February 21, 2016.

On February 21, 2016, Mr. Keebler met with Bloom, Davis, and Miller at Carl's Jr. in Tooele. Lavoy Finicum had just been killed a few weeks prior. At the start of the meeting, Mr. Keebler mentions a potential "military reserve," sponsored by the State of Utah, to protect Utahans against the federal government during marshal law. To better prepare, he suggests doing a reconnaissance at Dugway Proving Grounds. Miller dismisses the idea as stupid and unworthy of further discussion.

Next, Mr. Keebler expresses concerns about the Finicum family. He thinks their lives are in danger from the federal government. Miller loses it. He accuses Mr. Keebler of wasting time on the Finicums. He accuses Mr. Keebler of being all

---

[15] His comments about Muslims and other immigrant groups are also easily misconstrued. When Mr. Keebler would speak about Muslims, for example, he usually meant sleeper cell terrorists bent on destroying America.

8

talk and no action ("everything is mañana"). He calls the POA/PDF a group of do-nothing "Facebook fuckin' Nazis."

After taking this abuse from Miller, Mr. Keebler opens the floor to suggestions about what the POA/PDF should do. Davis and Bloom suggest something vaguely more aggressive. Miller pushes Mr. Keebler to target Muslims and makes fun of him for never venturing beyond Tooele County. Only then does Mr. Keebler suggest a reconnaissance in Salt Lake City. He doesn't know how to find Muslims, so Miller googles a mosque and leads the group downtown.

By this point in the operation, Miller is so incensed with Mr. Keebler that he insists on driving separately with Davis. Mr. Keebler rides with Bloom—and buries the dagger. During the drive, Mr. Keebler confides in Bloom, his closest "friend" in the POA/PDF. He complains at length about Miller and the direction he's trying to take the group. Bloom pledges undying loyalty to Mr. Keebler and vouches for Miller. When the group gets downtown, they scout a mosque.[16]

After the mosque, Miller leads the group past several government buildings. At the BLM office, Miller suggests sending a mail bomb to the facility (a la Ted Kaczynski) or using a truck bomb to blow it up (a la Timothy McVeigh). Mr. Keebler doesn't bite and the reconnaissance ends with a vague agreement to look for a future BLM target in a remote area.

The FBI has acknowledged its misconduct on February 21, 2016. Davis and

---

[16] The FBI frequently triangulated its undercover agents in this way.

his handler, Agent Daniels, exchanged the following text messages on February 22 and 23, 2016:

> *Davis:* So I was thinking on the drive home. I hope we didn't open Pandora's box in a way by taking [Keebler] to a mosque he might not have found on his own. With the case winding down on our end I am worried about our liability if he happens to go back sometime on his own.
>
> *Davis:* Ok. I'm not sure what to think right now about all this. I was listening to the January FTX and [Miller] blew up on [Keebler] about not doing anything and I'm not sure [Miller] realizes it but it sounds out of place. I think it is making us sound really bad on audio.
>
> *Davis:* If you look at the last four meets, [Miller] has blown out on [Keebler] in three of them. Like I'm all for pushing him but we can't sound more radical to him and be leading the group and to me that's what it sounds like we are doing.
>
> *Davis:* I feel responsible for last weekend and it's kinda grinding on me. I wanted to push [Keebler] outside his comfort zone to take his temperature not lead him into something. I am not down with giving him all the ideas like when [Miller] told him that we would have to mail a bomb to the BLM office on 200 W or drive a car bomb up to it. We can't be putting crazy ideas into a crazy guy's head.
>
> *Daniels:* I agree with you. Let me finish with the recordings and I'll have a talk with [Miller]. I haven't got the mail bomb stuff (Yikes)…
>
> *Davis:* It's like on the January FTX when [Miller] told him how to find pray times for Muslims and all the info on looking for them and [Keebler] said "oh good info, I didn't know that."

The importance of this operation cannot be overstated. The next time the group meets for an FTX, Mr. Keebler suggests vandalizing the cabins at Mt. Trumball.

Objection #6

We object to PSR ¶ 9 in its entirety. Mr. Keebler's rhetoric was largely

consistent throughout the investigation. There was no "acceleration" in early 2016. Furthermore, Mr. Keebler didn't visit any mosques before or after February 21, 2016.

Objection #7

PSR ¶ 10 fails to account for a critical conversation between Miller and Mr. Keebler on March 19, 2016.

Before presenting his idea to the group, Mr. Keebler takes Miller aside. He tells Miller he's decided what he wants to do: he wants to start a vandalism campaign against the BLM. He talks about slashing tires or damaging gates. Miller immediately suggests a pipe bomb.[17]

After Mr. Keebler and Miller settle on the idea of damaging a BLM, Mr. Keebler asks Miller if he should share the plan with the group or keep it between them. Despite knowing there were two prospective members present—in other words, two people they hardly knew—Miller urges Mr. Keebler to share the plan with everyone.

Objection #8

PSR ¶ 11 mischaracterizes the meeting between Mr. Keebler and Miller on April 8, 2016. After the FTX on March 19, 2016, the FBI, on its own, built a pipe bomb and made a video of Miller blowing up a desk. They planned an operation to show Mr. Keebler the video, hoping it would cement his intentions.

---

[17] For over a year, Miller repeatedly offered to build Mr. Keebler a pipe bomb or other destructive device.

11

On April 8, 2016, Miller drives to Mr. Keebler's home in Stockton. They drive out to the west desert. Miller brings a laptop and shows Mr. Keebler the video. He tells Mr. Keebler he's really "put himself out there," presumably by stealing explosives from work and building a bomb. Mr. Keebler is impressed by the bomb's destructive power and expresses interest, but he won't commit to anything. Miller presses him to decide "what and when" and pushes for a specific timeframe. Mr. Keebler says he wants to do "something" in "about a month." He expresses further reluctance by saying Miller doesn't appreciate the risks. Miller assures him he has "no baggage" and is fully committed to anti-government action.

Objection #9

PSR ¶ 11 omits an important meeting between Mr. Keebler and Bloom on April 29, 2016. Bloom arrives unannounced at Mr. Keebler's house. He brings a gift—a tactical cargo vest from Army Surplus. Bloom presents the gift, expresses his loyalty to Mr. Keebler, and presses him for further details on the Mt. Trumball operation. In response, Mr. Keebler suggests going to the United States-Mexico border instead. He suggests visiting Mt. Trumball on the way back, demonstrating reluctance as late as April 29, 2016—just one month before the attempted bombing.

    B.    *Offender Characteristics*

Mr. Keebler's arrest shocked everyone who knew him. Two years later, people continue to say, without exception, that he never would have committed this crime on his own, that it's totally inconsistent with his character. Mr. Keebler's age and poor health are also important factors.

Mr. Keebler is fifty-nine years old. He has hypertension, cardiac disease, high cholesterol, and a bad back.[18] In 2006 he nearly died of prostate cancer. He had open-heart surgery in 2012. Before his arrest, Mr. Keebler received regular care at the VA Hospital. It's been twenty-five months since he's seen his doctors.

Pretrial detention has also taken a toll. Mr. Keebler can't see his cardiologist, so he lives in constant fear of a heart attack. He suffers from situational depression and anxiety. He eats and sleeps poorly and carries nitroglycerine tablets at all times. Mr. Keebler also struggles with prison life. As someone who used to take great pride in being a law-abiding person, two years in jail has been humbling.

Luckily, Mr. Keebler's most enduring character traits remain intact. He continues to demonstrate "low…tolerance…towards anyone who breaks the law, abuses substances, or is perceived to act against or threaten the…United States." At his core, Mr. Keebler remains kind, generous, and outgoing. The letters submitted on his behalf are a testament to his many good qualities.

On balance, Mr. Keebler's offense and characteristics fully support his recommended sentence.

## The Purposes of Sentencing

The Court must also consider the purposes of sentencing—retribution, deterrence, incapacitation, and rehabilitation—while keeping in mind the parsimony principle, which states that the Court "shall impose a sentence sufficient,

---

[18] PSR ¶ 47.

13

but not greater than necessary."[19] At this point, sending Mr. Keebler to prison would not advance any sentencing goals.

With respect to "just punishment," Mr. Keebler's sentence should reflect the "harm done" and the "gravity" of his conduct.[20] Mr. Keebler has already been severely punished. He's spent twenty-five months in jail. He's been publicly humiliated and maligned as a "would-be terrorist."[21] After imprisonment, he faces a term of supervised release and an uncertain future with a felony conviction. Further incarceration could not be fairly characterized as "just."

Sending Mr. Keebler to prison would not promote respect for the law. In some cases, "a sentence of imprisonment may work not to promote respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."[22]

Mr. Keebler respects the law. He also appreciates the seriousness of his offense. And given his age, lifestyle, lack of criminal history, and the unique circumstances of his case, it's highly unlikely he will reoffend. He also needs very little in terms of rehabilitation.

## Conclusion

The balance of sentencing factors weighs strongly in favor of a 10-month

---

[19] 18 U.S.C. § 3553(a)(2); *United States v. Martinez-Barragan*, 545 F.3d 894, 904 (10th Cir.2008).
[20] *Walker v. United States*, 844 F.3d 1253, 1257 (10th Cir.2017) (internal citation omitted).
[21] Pamela Manson, *Leader of Utah Citizen Militia, called a "Would-Be Terrorist" by Prosecutor, Enters Plea in Attempted Bombing Case*, THE SALT LAKE TRIBUNE, April 26, 2018.
[22] *Gall,* 552 U.S. at 54 (quoting the district court below).

departure or variance from the guidelines. Mr. Keebler's offense, while serious, is heavily mitigated by the FBI's coercive tactics. His exemplary character before this offense strongly indicates he will not return to criminal behavior or pose a risk to society. Mr. Keebler has a good network of family and friends. And given his age and poor health, the sentence he recommends is sufficient, but not greater than necessary, to serve the purposes of sentencing.

For these reasons, Mr. Keebler urges the Court to impose to sentence him to 25 months in prison (*i.e.,* time served), two years of supervised release (including Veterans Court), no fine, and a $100 special assessment.

Dated the 5th of July, 2018.

                              Respectfully Submitted:
                              WILLIAM VERNON KEEBLER

By:   */s/ Adam G. Bridge*
        Adam G. Bridge
        Assistant Federal Public Defender